# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| JEFF SCHMITZ, | Civil No. 13-622 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| SUN LIFE ASSURANCE COMPANY OF CANADA, | |
| Defendant. | |

Mark M. Nolan **NOLAN THOMPSON & LEIGHTON**, 5001 American Boulevard West, Suite 595, Bloomington, MN 55437, for plaintiff.

Mark E. Schmidtke, **OGLETREE DEAKINS NASH SMOAK & STEWART PC**, 56 South Washington Street, Suite 302, Valparaiso, IN 46383, for defendant.

Plaintiff Jeffrey Schmitz brings this action pursuant to the Employee Retirement Insurance Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, seeking long-term disability ("LTD") benefits under a policy issued to Schmitz's former employer, Banner Engineering Inc., ("Banner") by Defendant Sun Life Assurance Company of Canada ("Sun Life").

Schmitz began working at Banner in 1993 as a director of sales and marketing and later as a corporate business manager. Schmitz was terminated in July 2008 based on poor work performance. Schmitz's coverage under the LTD policy issued by Sun Life ceased at the time of his termination. In July 2011, Schmitz was diagnosed with multiple

sclerosis, and in October 2011 he brought a claim for benefits under the LTD policy contending that the mental health issues and cognitive difficulties that resulted in his poor work performance and ultimately led to his termination were caused by multiple sclerosis.

Sun Life denied Schmitz's application for LTD benefits, and Schmitz filed this lawsuit contesting that denial. Both parties now move for summary judgment. Sun Life argues that it is entitled to summary judgment on numerous grounds including that its denial of LTD benefits was neither arbitrary nor capricious. Schmitz argues that Sun Life's denial was not supported by reasonable and substantial evidence. Because the Court concludes that Sun Life's denial of LTD benefits was supported by substantial evidence in the record, the Court will grant Sun Life's motion for summary judgment and dismiss Schmitz's ERISA claim.

## BACKGROUND

## I.    THE POLICY

During Schmitz's employment, Banner sponsored LTD benefits to its employees under an employee disability benefit plan ("the Plan") pursuant to ERISA. LTD benefits under the Plan were funded in part by an insurance policy ("the Policy") issued by Sun Life to Banner. (Second Decl. of Mark E. Schmidtke, Ex. A (Administrative Record ("AR")) at 65, Mar. 7, 2014, Docket Nos. 32-35.)[1]

---

[1] The Administrative Record was filed as Exhibit A to the Second Declaration of Mark E. Schmidtke, and spans Docket Numbers 32 through 35. Page references to the Administrative Record in this Order refer the consecutive Bates number pagination.

### A.  Policy Benefits

Under the Policy all full-time employees were eligible for LTD coverage.  (AR 67.)  With respect to that coverage, the Policy provides:

> If Sun Life receives Notice and Proof of Claim that an Employee is Totally or Partially Disabled, a Net Monthly Benefit will be payable, subject to the Limitations and Exclusions.
>
> To be eligible to receive a Net Monthly Benefit, the Employee must:
>
> 1. satisfy the Elimination Period with the required days of Total or Partial Disability;
> 2. provide proof of continued Total or Partial Disability; and
> 3. have regular and continuing care by a Physician who provides appropriate treatment and regular examination and testing in accordance with the disabling condition.

(AR 104.)  The Policy defines the elimination period as "a period of continuous days of Total or Partial Disability for which no LTD Benefit is payable."  (AR 81.)  The elimination period specified in the LTD schedule of benefits is ninety days and begins on the first day of total or partial disability.  (AR 72, 81.)

The Policy defines "Partial Disability or Partially Disabled" as meaning that "the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation and the Employee has Disability Earnings of less than 80% of his Indexed Total Monthly Earnings."  (AR 82.)  "Total Disability" or "Totally Disabled" means that "the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation."  (AR 83.)  For employees such as Schmitz that earned more than $100,000 annually, the Policy places

no durational limit on the receipt of LTD benefits in the event those employees become totally disabled within the meaning of the Policy.  (AR 101, 127.)

The Policy states that "Material and Substantial Duties means, but is not limited to, the essential tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation.  Material and Substantial Duties does not include any tasks, functions, skills or responsibilities that could be reasonably modified or omitted from the Employee's Own Occupation."  (AR 81.)  The Policy defines "Own Occupation," in turn, as "the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began. Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location."  (AR 82.)

"Sickness" under the Policy "means illness, disease or pregnancy."  (AR 76.)  And the Policy specifies that "[a]ny disability, because of Sickness, must begin while the Employee is insured under this Policy."  (AR 76.)  The Policy includes coverage for mental illness but such coverage ceases after a period of twenty-four months unless the employee is "confined in a Hospital or Institution licensed to provide psychiatric treatment."  (AR 110.)

## B.    Claims

With respect to claims, the Policy provides that "Sun Life must receive Notice and Proof of Claim prior to any payment under this Policy."  (AR 122.)  For LTD coverage,

"written notice of claim must be given to Sun Life no later than 30 days before the end of

the applicable Elimination Period or, within 30 days after the termination of this Policy, if

earlier." (AR 122.) Notably, an employee ceases to be insured under the Policy on "the

date employment terminates." (AR 114.) As for proof of an LTD claim, the Policy

provides that "proof of claim must be given to Sun Life no later than 90 days after the

end of the Elimination Period." (AR 122.) With respect to the content of Proof of Claim,

the Policy provides that:

> Proof of Claim must consist of:
> - a description of the loss or disability;
> - the date the loss or disability occurred; and
> - the cause of the loss or disability.
>
> . . . .
>
> Proof of Claim for disability must include evidence demonstrating the disability including, but not limited to, hospital records, Physician records, Psychiatric records, x-rays, narrative reports, or other diagnostic testing materials as appropriate for the disabling condition.
>
> Proof must be satisfactory to Sun Life.

(AR 122-23.)

> Finally, under the Policy, Sun Life has the
>
> entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy. This discretionary authority includes, but is not limited to, the determination of eligibility for benefits, based upon enrollment information provided by the Policyholder, and the amount of any benefits due, and to construe the terms of this Policy.

(AR 123.) With respect to judicial review, the Policy provides that "[a]ny decision made

by Sun Life in the exercise of this authority, including review of denials of benefit, is

conclusive and binding on all parties.  Any court reviewing Sun Life's determinations shall uphold such determination unless the claimant proves Sun Life's determinations are arbitrary and capricious."  (AR 123.)

## II.    SCHMITZ'S EMPLOYMENT AT BANNER

Schmitz began working for Banner on September 30, 1993.  (AR 27.)  From 2000 until his termination on July 2, 2008, Schmitz held the position of corporate business manager.  (AR 27, 47.)  As a corporate business manager, Schmitz's job duties involved providing territory support to sales representatives and distributor organizations, developing strategic action plans, maintaining and growing existing accounts, visiting account holders, providing in-house support to other Banner departments, training sales representatives, and developing trade shows and promotional activities.  (AR 31.)

### A.    Performance Evaluations

Performance evaluations of Schmitz early in his employment at Banner reflect generally positive impressions of his work performance.  (AR 323-30.)  As early as 1998, however, evaluations indicate that Schmitz needed "to work on his organizational skills, paperwork, time management, etc." and also needed "to take care in his communication style and working relationship with his co-workers."  (AR 330; *see also* AR 332.)

A September 2005 performance review included many complimentary remarks about Schmitz's knowledge of the business and his "good working relationship" with other members of his group.  (AR 317.)  The review also stated:

> In each of Jeff's previous reviews, we have discussed the need for Jeff to use tact and diplomacy when dealing with people inside Banner Engineering.  The same applies to dealing with those external to our building and to Banner.  He is aware of this issue and I think he works to improve himself in this area.  I still hear comments that he can be a pain-in-the neck and that he can at times be a bit of a "bull in the china closet".  Some of these comments are relevant, some of these comments are made by those who want the bureaucracy of the company to determine priorities.  Jeff is learning to recognize when and how hard to push.

(AR 317.)  The review concluded "I am pleased with Jeff's performance in this position at Banner.  He is a good hard worker.  He gives us his best effort.  He is an excellent employee for Banner Engineering."  (AR 317.)

In an evaluation reviewing Schmitz's performance from September 2005 to September 2006, Schmitz's supervisor concluded that Schmitz needed "to continue to make significant progress in most areas."  (AR 311.)  The supervisor explained that "the only area where I feel you are performing at a level you need to be is the Product knowledge area."  (AR 311.)  The evaluation noted that Schmitz had organized factory resources personnel well and did a "Good Job" of communicating new product development activities.  (AR 312.)  The supervisor concluded "Jeff:  You are a very talented person.  As you indicated yourself; your performance during the past year has not been what either you or I would like.  We need you to perform at the top of your game in the future.  I would like to start 'fresh' for the coming year and erase the past."  (AR 314.)

## B.     Termination

No information documenting Schmitz's performance in 2007 or 2008 is contained in the Administrative Record.  (AR 1515.)   However, Banner made a decision to terminate Schmitz on June 16, 2008, with an effective termination date of July 2, 2008, apparently based on poor work performance.  (AR 1515.)[2]

## III.    MENTAL HEALTH TREATMENT DURING BANNER EMPLOYMENT

## A.     Psychiatrist Dr. William Callahan

From February 2007 through September 2008 Schmitz was treated by psychiatrist Dr. William Callahan for bipolar disorder, major depression, anxiety disorder, and obsessive personality traits.  (AR 731-44.)   During these meetings, Dr. Callahan made notes that are relevant to the present motions, including:

- February 13, 2007:  Returns for reassessment of major depression, generalized anxiety disorder, obsessive personality traits, medication management and brief supportive psychotherapy.  Jeffrey reports that his mood and affect are bright. . . . He's coping well at work and actually enjoying it.  He's no longer looking for a new job, he's not seeing a therapist.  (AR 731.)

- April 17, 2007:  Jeffrey called last week.  He was talking rapidly.  He was over excited.  He came in today with his wife.  She describes him as talking rapidly, being rude and intrusive, having little insight, having poor judgment about social circumstances.  (AR 732.)

- July 24, 2007:  Jeff is awake, alert, animated and below hypomanic today.  He's thinking clearing.  He reports that his business decisionmaking is sound. . . . Jeff has stress at work because of the ongoing challenges of managing his production and marketing team but this is business he says.  (AR 734.)

---

[2] Following his termination, Schmitz applied for and received unemployment benefits from the state of Minnesota.  (AR 45, 304-07.)   Schmitz received $6,456 in unemployment benefits in 2008 and $10,497 in 2009.  (AR 828-29.)

- September 4, 2007:  He has switched into a depressed phase.  He's depressed and anxious. . . . He's having some trouble concentrating at work.  He states "I have to maintain a leadership posture."  (AR 735.)

- September 11, 2007:  Today Jeff is anxious, obsessive and moderately depressed. . . . he's advised to return to Michael Driscoll, an individual therapist who has worked with him before when he has been anxious and depressed.  (AR 736.)

- October 2, 2007:  Today Jeff is less anxious, less obsessive but still mildly to moderately depressed. . . . His mania and expansive thinking are gone, he did have some mild self referential thinking about whether he would get fired for his mental illness.  Apparently, he was reassured by his employer that this is not the case.  (AR 737.)

- October 23, 2007:  Jeff is less anxious and less depressed but quite obsessive. . . . Jeff is getting along with his wife, he is working, he is adequately productive, he has been assured that there is no plan afoot to fire him or lay him off.  (AR 738.)

- January 22, 2008:  Jeff is managing his anxiety and depression but he tends to still be obsessive and somewhat narcissistic. . . . Jeff is getting along well with his wife, he is working fulltime, he is traveling and performing.  (AR 1756.)

- April 1, 2008:  Jeff reports that he has energy at work, he is creative, he has just recently had a good 360 degree evaluation.  His wife reports that on a family vacation he was over the top and obnoxious with his parents and with her.  (AR 740.)

- April 22, 2008:  [H]is wife reports that his mood has stabilized substantially, he is less irritable, he is sleeping better, he is not grandiose, he is less erratic.  (AR 741.)

- May 20, 2008:  Jeffrey is awake, alert with neutral mood today. . . . Things are going well at work and at home.  (AR 742.)

- July 22, 2008:  Jeffrey continues to see Mike Driscoll to deal with couples issues.  His couples problems are complicated by losing his job, he was laid off, he has a reasonable severance package but is now looking for employment in sales marketing of devices.  (AR 743.)

- September 23, 2008:  Jeffrey remains unemployed, he continues to look for work daily. . . . [H]is mood has leveled off. . . . He is getting along well with his wife although she is concerned about his unemployment.  (AR 744.)

B.      **Therapist Mike Driscoll**

Schmitz began seeing therapist Michael Driscoll in October 2007, and continued to see Driscoll on and off until October 28, 2011.  (AR 152-228.)  Driscoll's treatment notes include the following:[3]

- October 15, 2007:  Represents after a one year absence.  Continues to struggle with disenchantment in his work & the thought that he is ineffective.  (AR 227.)

- October 26, 2007:  Continues to doubt his capability to manage and lead and work.  (AR 226.)

- October 31, 2007:  Continues to flounder at work . . . . his inner voice seems to conflict with a[n] accurate perception of his work.  (AR 225.)

- December 10, 2007:  Performance appraisal at work was subpar.  6 months to get things shaped up.  (AR 223.)

- December 28, 2007:  Continuing to struggle at work.  (AR 222.)

- January 23, 2008:  Get[ting] more accomplished at work.  (AR 221.)

- March 3, 2008:  Had a peer review at work (360) plus a work up through their pscyh consultant at the company.  Feels relieved the genie is out of the bottle.  Wife believes Jeff's behavior at work is jeopardizing the family security.  Clearly struggles with accurate perception.  (AR 220.)

- March 28, 2008:  Work is going better.  (AR 219.)

- April 2, 2008:  Work is going better.  No fallout from recent examination.  (AR 218.)

- May 2, 2008:  Mood is stable.  Endeavoring to be more patient.  (AR 214.)

---

[3] Driscoll's notes are largely illegible.  (*See* AR 2058 ("Psychotherapy notes from Dr. Driscoll (10/15/07-10/28/11) indicated that Mr. Schmitz was seen 76 times during this time period.  The notes on file are brief and illegible.  The first note indicated that therapy resumed after more than a year of absence.  Sessions focused on work and relationship issues.  Notes do not contain information regarding mental status examinations.").)  Given the illegibility of the notes, this Order cites to these notes, but has relied on the parties' and reviewing doctors' recitations of the contents of Driscoll's notes in interpreting the handwriting.

- May 31, 2008:  Jeffrey has a job review on Monday.  Prepared to get a lot of feedback.  Mood has been elevated the last couple of days.  (AR 212.)

- June 6, 2008:  Job appraisal was a major ass-kicking.  Realizes the situation is untenable to sustain.  Jeff has arranged a meeting with VP of HR.  (AR 211.)

- June 16, 2008:  Got fired today & offered a severance package.  14 years' service – very distraught.  (AR 210.)

- July 7, 2008:  Completed resume – got it posted on web sites.  Hoping to experience a successful job search.  (AR 207.)

- July 14, 2008:  Job search is feeling productive.  Mood is stable no evidence of hypomania.  (AR 206.)

- July 21, 2008:  No interviews yet.  Mood is stable no hypomania.  (AR 205.)

- July 28, 2008:  No real movement with the job search.  Networking with consistency.  (AR 204.)

- September 15, 2008:  Job search has proven unfruitful.  (AR 203.)

- September 29, 2008:  Increased insights that his job search is half-baked.  Increased anxiety – at times panicked – no evidence of hypomania – increased struggles with sense of self-worth.  (AR 202.)

- October 22, 2008:  Interview at Honeywell yesterday.  Going back on Monday for a second look.  Some concern about managing potential hypomania.  (AR 201.)

- November 3, 2008:  Honeywell position is still in flux.  (AR 200.)

- January 14, 2009:  Mood is stable – no evidence of hypomania.  (AR 199.)

- January 23, 2009:  Wife continues to have concern – perceives increased mania of late.  Questions how realistic his goals are.  (AR 198.)

- February 25, 2009:  Wife reports that Jeff often has inappropriate social behavior.  (AR 194.)

- March 23, 2009:  Job prospects are bleak.  Recent opportunities have dried up.  (AR 191.)

- May 15, 2009:  Got a job with a Banner connection.  Contract 2-3 months and possibly to fulltime.  (AR 189.)

## IV.     EMPLOYMENT AT PPT

Schmitz accepted an offer of employment from PPT Vision, Inc. ("PPT") in May 2009 to work as a contract employee in a marketing and sales position.  (AR 46, 251-52.) Schmitz was paid $7,000 per month and worked forty hours per week.  (AR 251.) Schmitz's job description was similar to the position he held at Banner.  (AR 253.)  At PPT Schmitz was to be responsible for doubling sales in the Asian sales area over a three year period by generating leads, improving PPT's website, developing a public relations plan, creating sales tools, reestablishing PPT's brand, improving customer satisfaction, and conducting market research.  (AR 253-54.)  The position required Schmitz to have problem solving skills, be able to "effectively manage multiple projects and priorities," display "maturity and ability to maintain enthusiasm and confidence during the highs and lows associated with building a business," and be disciplined, passionate, dedicated, approachable, aggressive, self-starter, a team focused contributor and forthright communicator, resourceful and tenacious with a high level of self-confidence.  (AR 255.)

### A.     Performance

Schmitz was offered a full-time position as a regular, non-contract employee on April 26, 2010.  (AR 1452-57, 1471.)  An evaluation of Schmitz's performance between November 1, 2009 and October 31, 2010 revealed that Schmitz was meeting or exceeding PPT's expectations in a number of work areas.  (AR 1416-17.)  The evaluation noted that "Jeff Schmitz has the right background, temperament and machine vision business experience to become a high performing Marketing leader."  (AR 1417.)  In terms of

improvements the evaluation noted that Schmitz needed to "[c]ontinue more attention to detail, demonstrated by correct spelling, grammar and thoughtful messages on all communications." (AR 1417.) Schmitz was also instructed to exercise "[m]ore patience in meetings – do not interrupt others." (AR 1417.)

One of Schmitz's supervisors at PPT met with Schmitz for "performance and behavior coaching" on numerous occasions between Fall 2010 and early 2011. (AR 1415.) The administrative record contains emails from PPT employees indicating that Schmitz was struggling to create good marketing materials, sent emails reflecting poor business judgment, and sent confidential emails to the wrong recipients. (AR 1422-38.)

Schmitz submitted a statement indicating that his wife assisted him in his work at PPT – such as reviewing emails and keeping track of his appointments. (AR 1186.) He also stated that he was only able to retain his job at PPT for as long as he did because his boss was his friend. (AR 1187.)

### B.    Termination

Schmitz was terminated from his position with PPT on February 24, 2011 for unsatisfactory work performance. (AR 1364, 1370.) PPT indicated that Schmitz was discharged because he was "not the right person for the position," explaining that there were "many pieces of evidence that pointed to the wrong person being in the wrong

position and no improvement was shown to correct this by the employee." (AR 1377-78.)[4]

## V.   SCHMITZ'S MENTAL HEALTH TREATMENT DURING AND FOLLOWING PPT EMPLOYMENT

### A.   Therapist Mike Driscoll

Schmitz continued to see Driscoll during and immediately following the termination of his employment at PPT. During these sessions, Driscoll observed:

- June 17, 2009:  New job is going – managing anxiety levels. Happy to be signed on as permanent employee. Mood is stable – no evidence of hypomania. Moderately less anxious. (AR 188.)

- June 29, 2009:  Job is going well. (AR 187.)

- August 5, 2009:  Contract has been extended at work. (AR 184.)

- August 12, 2009:  Spinning his wheels a bit at work. Slept the weekend away – less excited about the prospect of being offered permanent employment. (AR 183.)

- October 12, 2009:  Energy for work has increased. Fruitful trade show produced viable leads. Hopeful to make sales products numbers. (AR 180.)

- December 2, 2009:  Job situation is seeming more stressed. Also got a good call from a head hunter. (AR 178.)

- April 26, 2010:  Finally offered a permanent situation at work – reasonable offer. Enjoying the job. Mood is stable. (AR 173.)

- May 26, 2010:  Recent negative feedback in a management meeting where the quality of marketing materials need improvement. Tried not to be defensive. Boss is leaning on another veteran. Feeling vulnerable again. (AR 172.)

- June 9, 2010:  Job situation is status quo. Boss has left the organization – new Boss to follow. (AR 171.)

---

[4] Following his termination from PPT, Schmitz again applied for unemployment benefits, and received weekly benefits in the amount of $572 between February 27, 2011 and September 24, 2011. (AR 250.)

- July 12, 2010:  Work . . . is status quo.  Looking at opportunities through head hunters.  (AR 170.)

- October 6, 2010:  Job is going very well.  Getting along famously with new Boss.  Mood is stable – no evidence of hypomania.  (AR 169.)

- February 7, 2011:  Job . . . tensions – starting to look for other options.  (AR 167.)

- March 4, 2011:  As expected lost job last week.  2 wks severance pay – hopefully will qualify for unemployment compensation wages although given advance notice this would happen is predictably anxious.  (AR 166.)

- May 18, 2011:  Still unemployed.  I need to develop direction.  Continues to be active in networking groups – no leads – no interviews.  (AR 161.)

### B.    Dr. Floyd Anderson

On January 6, 2009 Schmitz saw Dr. Floyd Anderson on referral from Dr. Callahan for a psychiatric evaluation.  (AR 242-43.)  Schmitz told Anderson that he has been diagnosed with bipolar disorder as well as obsessive compulsive disorder.  (AR 242.)  Schmitz's chief complaint to Dr. Anderson was attention deficient disorder (AR 242.)  Dr. Anderson's mental status examination revealed that Schmitz was "pleasant, cooperative, and well groomed."  (AR 243.)  Dr. Anderson reported a current Global Assessment of Functioning ("GAF") score of 60 and in the past year a maximum score of 85 – which is within the range of absent or minimal symptoms, good function in all areas, and no more than everyday problems or concerns.  (AR 243.)

In June 2009 Schmitz reported to Dr. Anderson that his medications were working well.  "He denies side effects and states that he is able to concentrate well.  His job is still difficult, with him in the middle of a three month trial period.  However, he is optimistic

stating that he knows what he is doing and that he expects to be given an excellent job review." (AR 240.)

In September 2009 Schmitz reported to Dr. Anderson "that he has felt depression coming on as the days get shorter. . . . His work remains a stressor.  He states that he was passed over for full-time work, but he did have his part-time contract extended." (AR 239.)  Dr. Anderson's assessment was "[p]atient with a number of worries, currently trying to cope with higher doses of antidepressants."  (AR 239.)

In March 2010, Dr. Anderson's assessment was "[b]ipolar disorder, stable." (AR 237.)  At his appointment, Schmitz reported that "he is looking for a new job with a larger company and overall a better position."  (AR 237.)

In May 2010, Dr. Anderson's evaluation indicates that Schmitz's "[m]ental status shows normal function."  (AR 233.)  In September 2010, Dr. Anderson again noted that "[m]ental status is really normal."  (AR 232.)  In December 2010, Dr. Anderson assessed Schmitz as "[b]ipolar Disorder, currently stable as we try to switch mood stabilizers." (AR 231.)

## VI.    MULTIPLE SCLEROSIS DIAGNOSIS

### A.    Dr. Eric Schenk

On July 22, 2011, Schmitz was mowing his lawn when his left leg "stopped working."  (AR 508.)  He went to urgent care where an MRI was performed.  (AR 508.) Based on this MRI Schmitz was referred to neurologist Dr. Eric Schenk for an evaluation. (AR 508, 857.)  On July 26, 2011, Dr. Schenk performed the evaluation and concluded

that Schmitz's "symptomatology [was] strongly suggestive of multiple sclerosis." (AR 859.)  Dr. Schenk also suspected that Schmitz "has probably had the condition at least 9 years" based on Schmitz's report that he began experiencing problems with his left leg nine years ago.  (AR 857, 859.)  Dr. Schenk ordered a second MRI to confirm the diagnosis.  (AR 859, 1949-53.)

### B.      August 2011 Hospitalization

Schmitz was hospitalized at the University of Minnesota Medical Center ("Riverside") from August 16 through August 30, 2011 "with a 2-day history of delusional thoughts and manic behavior as well as personality changes which have occurred over the past several years."  (AR 664-80.)  Schmitz was diagnosed at discharge with, among other things, "[o]rganic psychosis and mood disorder secondary to multiple sclerosis."  (AR 664.)  Upon discharge, Schmitz's internal medicine assessment stated "[b]ipolar illness, incompletely compensated.  Uncertain as to what degree mood liability may be contributed to by patient's multiple sclerosis."  (AR 665.)  An in-patient neurology consult "concluded that regarding the patient[']s psychiatric dysfunction, it is nearly impossible to know how much of it can be exampled by an underlying mood disorder vs. cognitive changes secondary to multiple sclerosis vs both."  (AR 665.)  But the consult did explain that "nearly two-thirds of patients with MS have detectable psychopathology at some time."  (AR 674.)

### C.    Dr. Erin Holker

Dr. Holker completed a neuropsychological evaluation of Schmitz on August 25, 2011, which included an interview with Schmitz as well as a review of his medical records.  (AR 246-49.)  Dr. Holker noted that Schmitz reported "a long standing history of depression, which was treated for many years by a psychiatrist."  (AR 246.)  Dr. Holker also stated that he was diagnosed with bipolar affective disorder and that "medications have allowed his bipolar disorder to be fairly well controlled."  (AR 246.)  During the interview Schmitz reported that he "noticed difficulty with memory for some time" and "[h]e has noticed difficulty with word finding for about a year as well as comprehension, attention and concentration" but "denied difficulty with decision making or organization."  (AR 246.)

Schmitz's performance on a global measure of cognitive function was "low average."  (AR 248.)  Dr. Holker concluded:

> Current results indicate mild executive dysfunction, including impairment in problem solving, conceptualization and perseverations.  He had difficulty shifting cognitive set, and behaviorally he was somewhat impulsive and careless, particularly in his drawings.   Visual construction reflected a relative weakness for him, although again this appeared to be associated with difficulty in impulsivity.  Psychomotor processing speed was slowed. Verbal learning and memory, sustained attention, and language abilities all fell within normal limits.

(AR 248.)   With respect to daily functioning, Dr. Holker opined that "Schmitz may require some assistance managing his instrumental activities of daily living for the time being, particularly those that involve significant organization, such as managing

medications or finances. . . . He may have difficulty managing large, complex tasks . . . ."

(AR 248.)

### D.      Dr. Floyd Anderson

On September 29, 2011, Schmitz returned to see Dr. Anderson.  Dr. Anderson noted that Schmitz "presents with his baseline mental status again."   (AR 234.) Dr. Anderson also explained that "[t]he working diagnosis of Bipolar Disorder should be changed to an Organic Affective Syndrome Associated with Multiple Sclerosis." (AR 235.)

## VII.   SOCIAL SECURITY APPLICATION

Schmitz filled out an application for Social Security Administrative disability income ("SSDI") dated October 14, 2011.  (AR 256-71.)  In the application, Schmitz described how his illnesses limited his ability to work, explaining "limited cognitive capabilities from multiple sclerosis exasperation.  Poor judgment from bipolar disorder. When I am depressed, I am completely shutdown mentally and am bedridden.  When I am manic I make bad judgments and am offensive.  I cannot manage my time or actions to productive tasks."  (AR 261.)  With respect to "Getting along with others" Schmitz reported

> [t]his is one of my greatest challenges.  I have had a very difficult time in the workplace working alongside colleagues.  Others have a difficult time understanding me and my quirkiness.  At my last job, there were several people who refused to work with me.  I still do not understand what I did wrong.  Also, my boss had to pull me aside to tell me to watch my behavior among two female employees as they had told my boss that they felt uncomfortable around me. . . . I have worked for 7 years with a therapist to

change my behaviors but am told that I continue to decline relationally.  It doesn't seem to matter how hard I try, this part of daily living just doesn't work for me.

(AR 269.)

## VIII.   CLAIM SUBMISSION

On October 13, 2011, Schmitz submitted a claim for LTD benefits under the Policy.  (AR 46.)  In his application Schmitz indicated that he "first noticed symptoms of [his] illness" in March 2002.   (AR 44.)   Schmitz described "the nature of [his] illness/condition and its first symptoms" as "Multiple Sclerosis – loss of cognitive capabilities/Bipolar Disorder."  (AR 44.)  Schmitz indicated that he was first treated by a physician on July 26, 2011, that the first day he was unable to work was July 1, 2008, and that he had not returned to work since that day.  (AR 44.)

Attending physician Dr. Philip Davis completed an "Attending Physician's Statement" as part of Schmitz's application and stated a primary diagnosis of "MS, Bipolar depression."   (AR 58.)   He noted objective findings of left leg weakness, cognitive changes, and bipolar, and indicated that "symptoms first appeared" in 2002. (AR 58.)   Dr. Davis also noted "long standing mood issues leading to diagnosis of bipolar, MS recently diagnosed but felt to be active prior to diagnosis."   (AR 60.) Dr. Davis also noted that Schmitz first showed signs of depression in August 2006, and that depression limited Schmitz's functional capacity by making it difficult for him to concentrate.  (AR 61.)   Davis noted "severe" or "extreme impairment of ability to function" with respect to interpersonal relations, daily activities, ability to think/reason,

- 20 -

understand and carry out instructions, sustain work performance, attention span, concentration, past/present memory disturbance, and "moderate" impairment with respect to "Occupational/social (e.g., respond appropriately to supervision, supervise or manage others)".  (AR 62.)

In a letter dated October 24, 2011, Sun Life notified Schmitz that it had received his claim.  (AR 137.)  In the letter Sun Life explained that "this claim is submitted outside of the Notice and Proof of Claim Timeframes for submission."  (AR 137.)  Sun Life requested that Schmitz provide, "[a] brief note explaining why this claim was submitted beyond the time frames allowed for in the policy," information regarding his work at PPT, and other materials.  (AR 138.)

On November 2, 2011, Schmitz provided Sun Life with the reason for his delay in applying for benefits, explaining:

> I was diagnosed with bipolar disorder in 2007.  The medical evidence (MRIs, Neuro psychological test, . . .) of my cognitive disability that impaired me in 2007 and 2008 just became available.
>
> The MS that impaired my cognitive ability was just recently diagnosed (August 2011).  I had an MRI brain scan done at the time which revealed many brain lesions and the neurologist assigned my case stated that based on the number of lesions that this condition has been ongoing for many years.  I was hospitalized in August of this year and at the discharge meeting the attending psychiatrist stated that "the final diagnosis is the patient has MS and resulting from that has bipolar." . . . Had I been correctly diagnosed when the MS episodes began, I would have applied for disability insurance as the link to my diminished cognitive ability would have been clear.  The combined diagnosis of MS with bipolar condition explains my erratic behavior, poor decision making and lack of lucid thinking that contributed to my dismissal from Banner Engineering.  My cognitive capabilities were impaired such that they were no longer adequate for performing the duties of my position at Banner.

(AR 245.)

## IX.    SUN LIFE'S DECISIONMAKING PROCESS

### A.    Investigation

Claims Bureau USA, Inc. was retained by Sun Life to "conduct background investigation on and a face-to-face visit with [Schmitz]," to assess the viability of Schmitz's claim of long-term disability.  (AR 374.)  Alex Graber of Claims Bureau completed an investigative report dated November 17, 2011, summarizing his findings, including Schmitz's professional and social activity on social media.  (AR 374-502.)

Patricia Johnson of Claims Bureau conducted a face-to-face visit with Schmitz on November 12, 2011.  (AR 503-04.)  Johnson and Schmitz discussed his employment history, and Schmitz could not recall a specific incident that led to his termination "but knew he was manic during then."  (AR 511.)  Following his termination, Schmitz reported to Johnson that he looked for another job from July 2008 to May 2009 using job searching assistance through a company and also extensive networking with a "job club." (AR 511-12.)

With respect to his employment at PPT, Schmitz stated that his "duties became too difficult.  During manic episodes he might have overestimated the weight of his own opinions."  (AR 512.)  Schmitz explained that he was terminated "for poor job performance and not getting along with coworkers."  (AR 512.)  Schmitz also stated that some of his treating mental health professionals "told him that some of his employment issues were related to his mental health issues."  (AR 512.)

Johnson also inquired about Schmitz's restrictions and limitations.

> Mrs. Schmitz reported [Schmitz]'s MS has affected his cognitive ability.
> She takes care of the family's finances and helps [Schmitz] manage his
> medical appointments. She attends as many of his medical appointments as
> she can because it is difficult for [Schmitz] to remember details.
> [Schmitz]'s thought processes have slowed and he gets confused easily
> while taking direction. He is more fatigued and less focused. His memory
> is poor.

(AR 512.)

Finally, Johnson discussed with Schmitz the reason for his delay in filing his claim with Sun Life. Schmitz explained "that he did not learn of his MS diagnosis until July and it explained much. Prior to his diagnosis, he did not accept that he suffers from bipolar disorder and mania. It makes sense to him now, considering his work issues and other problems." (AR 514.)

## B.   Review by Dr. Margaret O'Connor

On January 22, 2012, board certified neuropsychologist Dr. Margaret O'Connor reviewed Schmitz's medical file. (AR 2055-59.) O'Connor reviewed psychiatric notes from Dr. Callahan and Dr. Anderson, the neurology consultation conducted on August 17, 2011, the evaluation conducted by Dr. Holker on August 25, 2011, medical records from Riverside, and psychotherapy notes from Driscoll. (AR 2055.) Dr. O'Connor noted that Schmitz's file "indicates th[e] presence of mild executive deficits with impairment in problem solving, conceptualization and perseveration." (AR 2058.) Dr. O'Connor was asked to opine on whether Schmitz's MS diagnosis in

August 2011 "may be responsible for his issues in holding employment since 2008."

(AR 2058-59.)  Dr. O'Connor responded:

> There is no information on file indicating that Mr. Schmitz had cognitive problems around 6/16/08.  A note from his psychiatrist dated 7/22/08 indicated that he was laid off from work and that he was looking for employment in marketing sales.  This suggests that his cognitive functions were sufficient[ly] intact at that time.  Psychiatric notes from Dr. Anderson indicate that Mr. Schmitz complained of concentration problems in January 2009 but most notes between 6/16/08 and the time that testing was performed in 2011 suggest intact mental status.

(AR 2059.)

### C.    Review by Dr. Peter Mirkin

On January 30, 2012, board certified psychiatrist and neurologist Dr. Peter Mirkin also reviewed Schmitz's medical records "from the perspective of his mental health issues."  (AR 2064-75.)  Dr. Mirkin was asked to opine on whether Schmitz's medical records reflected an increase in symptoms or treatment leading up to his termination "that would support that his firing was a result of his mental health issues," whether the medical records indicate any period of time between his termination and the present when Schmitz was "psychiatrically incapacitated," and whether the medical records "support the diagnosis of bipolar disorder."  (AR 2065.)  In forming his opinion Dr. Mirkin reviewed employment documents from Banner as well as Schmitz's medical records. (AR 2065-71.)  In his analysis, Dr. Mirkin explained:

> It is evident that Mr. Schmitz has a bipolar disorder as well as multiple sclerosis.  It should be noted that both of these conditions have a range of symptom criteria that need to be present for periods of time before a criteria-based diagnosis can be established.  It should also be noted that

- 24 -

> both of these conditions have a fluctuating course with symptoms that come
> and go over periods of time.

(AR 2071.)  Dr. Mirkin further explained that although "[t]here is a connection between

mood disorders and multiple sclerosis" the relationship is "multi-factorial and complex,

and the extent to which they are direct consequences of the disease process or

psychological reactions to it remains unclear."  (AR 2071 (internal quotation marks

omitted).)

Upon review of Schmitz's medical records, Dr. Mirkin opined that although

Schmitz "has been diagnosed with multiple sclerosis and the evidence from his brain

MRI suggests that this disease process has been going on for some time . . . . there is no

evidence that he had any neurological symptoms until July 2011."  (AR 2071-72.)

Dr. Mirkin also noted that "[e]ven with his recent neurological symptoms his treating

physicians, Dr. Davis and Dr. Schenk, do not believe that he is impaired as a result of any

neurological or physical deficits."  (AR 2072.)  With respect to Schmitz's mood disorder

generally, Dr. Mirkin concluded:

> He has been treated for his mood disorder for many years.  However,
> although there have been periods of time when his mood disorder
> symptoms have interfered with his functionality, his mood symptoms have
> mostly not been at a level of severity that interfered with his capacity to
> function.

(AR 2072.)

With respect to whether Schmitz's medical records reflected an increase in

symptoms or treatment immediately prior to termination, Dr. Mirkin concluded that the

records did not describe symptoms "at a level of severity that interfered with his capacity

to function." (AR 2072.) Dr. Mirkin conceded that the notes from Driscoll provided "some evidence that he was having mood changes in the period leading up to his 6/16/08 termination" but "these symptoms were not described as at a level of severity that would have obviously interfered with his performance at his job." (AR 2073.) Dr. Mirkin concluded, "I am not able to state whether his mental health issues or his behavior were responsible for his job termination because the concerns of his supervisor and evaluator were not available to assess. Apparently he was given a satisfactory severance package it can be assumed that he was not terminated for cause." (AR 2073.)

With respect to whether Schmitz's medical records reflected a worsening in his condition between his termination from Banner and the present, Dr. Mirkin reflected that "from the time he was terminated from his job on 6/16/08 until he was hospitalized in August 2011 the records do not show that he had symptoms of a mental illness at a level that would support that he was psychiatrically incapacitated." (AR 2074.) Dr. Mirkin further explained:

> It should be noted that there is little doubt that throughout the period that is under review Mr. Schmitz had an underlying neurodegenerative disease process taking place. It is inaccurate to state that because he was eventually discovered to have this illness that this automatically implies that he was impaired by the process. It appears that he had no recognizable symptoms of multiple sclerosis and it cannot be assumed that his mood disorder was solely the result of his multiple sclerosis although unrecognized at that time. Even if his mood symptoms could in part be attributable to this disease his mood symptoms were not at a level of severity that would have limited him.

(AR 2074.)

Finally, Dr. Mirkin opined that Schmitz's medical records "do support that he has a diagnosis of bipolar disorder and the treatment has been appropriate for this condition." (AR 2075.)

### D.      Occupational Analysis

On January 31, 2012, Mary O'Malley, a vocational consultant, performed an occupational analysis of Schmitz's employment at Banner and PPT, for purposes of providing an analysis of the required physical and cognitive requirements of those positions.  (AR 2107-21.)   O'Malley concluded that Schmitz's Banner position "had supervisory responsibilities" while his PPT position did not.  (AR 2107.)   O'Malley concluded that both job positions involved "interpersonal relationships in job situations beyond receiving work instructions," making judgments and decisions, and directing, controlling, or planning activities for others.  (AR 2112-13, 2119.)   O'Malley also concluded that both positions required an employee to frequently maintain attention and concentration, adhere to an ordinary routine without special supervision, work in coordination with others or in close proximity to others without being distracted, and make simple work-related decisions.  (AR 2113, 2120.)  Both positions required frequent to constant public and peer interaction, and occasional to frequent ability to maintain socially appropriate behavior.  (AR 2114, 2120.)

### X.      DENIAL OF BENEFITS

On February 3, 2012, Sun Life denied Schmitz's LTD claim.  (AR 966-86.)  Sun Life began its analysis by explaining that Schmitz's late notice may have caused them

prejudice.  (AR 973.)  Despite the late notice, Sun Life engaged in "a comprehensive review of all the information currently available and either provided by [Schmitz] or gathered independently."  (AR 974.)

Sun Life then described the information it had considered in reaching its coverage determination.  Sun Life considered Schmitz's claim for benefits, Schmitz's application for social security disability benefits, statements from the interview with Johnson, information available from the public record included in Graber's investigation, information from Banner including Schmitz's personnel file, Schmitz's applications for unemployment benefits, employment and personnel information from PPT, O'Malley's occupational analysis, medical records from Driscoll, Dr. Callahan, Dr. Davis, the urgent care location, Dr. Anderson, Dr. Schenk, a Dr. Nelson, a Dr. Kholomyanski, Dr. Holker, and Riverside, as well as the medical reviews from Dr. Mirkin and Dr. O'Connor  (AR 974-83.)  Based on review of this information Sun Life "determined that you were not Totally or Partially disabled based on the terms of the policy at the time you left Banner Engineering."  (AR 983.)

Sun Life explained "[a]lthough it is clear that you have a long standing Bipolar Disorder and that at times you may have experienced exacerbations from this condition, the evidence does not support that you were Totally Disabled by this, or any other condition at the time that you were terminated from Banner Engineering."  (AR 984.)

> Rather, the information demonstrates that you were terminated for poor performance and by your own admission you did not inform your Employer that you had a medical condition that might interfere with your ability to perform your job duties.  There is no information in your employment file to help us understand any issues experienced around the time you were

> terminated.  The consulting psychiatrists review of the medical information
> around that time does not support an incapacitating psychiatric disorder was
> responsible for your leaving work.

(AR 984.)  Sun Life noted that this conclusion was supported by several facts including

that Schmitz sought unemployment benefits and in doing so "would have indicated on a

weekly basis that you were ready, willing and able to work," and that Schmitz worked for

almost two years at PPT and was hired as a full time employee within his first year there,

explaining "[c]learly, if you were not providing acceptable results or performance at that

time PPT Vision would have had no obligation to hire you."  (AR 984.)  Sun Life also

noted that the job duties at Banner and PPT were substantially similar, indicating that

Schmitz was not totally disabled when he left Banner.  (AR 984.)

Sun Life noted that the relevant inquiry was whether Schmitz was totally or

partially disabled on July 2, 2008, when his coverage ceased under the Policy.  (AR 966,

984-85.)  Therefore, Sun Life reasoned:

> [I]n August 2011 (when it appears you decompensated, were hospitalized
> and neuropsychological testing documents mild executive deficits) you
> were not eligible for coverage under the above captioned policy as your
> coverage terminated more than three years earlier.  Our psychiatric and
> neuropsychological consultants opinions and all other information in the
> file does not support you were cognitively or psychiatrically incapacitated
> prior to that time.

(AR 984-85.)  Sun Life concluded:

> The evidence does not support that the mild executive deficits in cognition
> demonstrated in the testing of August 2011 began while you were insured
> under this policy as your coverage had terminated.  Additionally, you were
> not receiving care of treatment for cognitive deficits or Multiple Sclerosis
> (MS) prior to August 2011 as would be required by the policy.  Although it
> is clear that you have been diagnosed with these conditions as of August
> 2011 unfortunately coverage was not in effect at that time.  Also your own

- 29 -

physicians have indicated that any physical deficits from MS are not
disability.

(AR 985.)

## XI.    APPEAL

On July 25, 2012, Schmitz requested an appeal of Sun Life's determination

denying benefits.   (AR 1096.)   Schmitz filed his appeal on October 25, 2012, and

included additional documentation that had not been available to Sun Life at the time of

its denial.  (AR 1110.)

### A.    Additional Materials

As part of his appeal, Schmitz included several new medical evaluations.

#### 1.    Dr. Michael Fuhrman Evaluation

First, Schmitz submitted a neuropsychological evaluation performed by

Dr. Michael Fuhrman on January 20 and 25, 2012.   (AR 991-97.)   Dr. Fuhrman

concluded that Schmitz's

neuropsychological results are abnormal.  His cognitive abilities are lower
than expected on a variety of the procedures.   Intellectual abilities are
moderately low, specifically under nonverbal conditions.  Memory abilities
are moderately low, especially under nonverbal conditions.   Attentional
abilities are mildly or moderately low.  Executive abilities are mildly low.

The overall results are compatible with cerebral dysfunction of mild-to-
moderate magnitude.   The dysfunction is localized in the prefrontal-
subfrontal circuitry (e.g., centrum semiovale), right hemisphere greater than
left hemisphere.

- 30 -

> This neuropsychological presentation is characteristic in the setting of demyelinating disease. The dysfunction is attributable to MS, despite the possibility of a minor development component.

(AR 996.) With respect to Schmitz's personality function in particular, Dr. Fuhrman concluded that "most individuals with [Schmitz's] profile are experiencing anxious-depressive disorder. . . . Importantly, many individuals with this profile may demonstrate an element of stoicism or denial. These individuals are image-conscious and eager to appear 'well' in front of other people. They may minimize personal shortcomings. They may somatize emotional/interpersonal conflicts by emphasizing 'medical' (as contrasted with mental-health) symptoms." (AR 996.) Dr Fuhrman also noted "[i]n reviewing the old electronic records . . . , I noted with interest the head CT for right-sided paresthesia in 1994. Although the question of demyelinating disease was not entertained at the time, I suppose that stigmata of MS may have been emerging by then" and that "[t]he history of bipolar disorder is relevant, because some features of emotional/behavioral disinhibition are likely to reflect multifocal involvement in the right hemisphere and the prefrontal-subfrontal circuitry." (AR 997.) With respect to future employment Dr. Fuhrman explained "[h]e hopes to return to work. . . . After taking into account the diagnosis of MS and the totality of physical and mental symptoms. I question whether he is capable of substantial gainful employment. I support the application for SSDI." (AR 997.)

### 2. Dr. Richard Lentz

Schmitz initially saw Dr. Lentz for a psychiatric evaluation from April through October 2012. (AR 1148.) Dr. Lentz concluded that "[a]fter an extensive evaluation, it

remains difficult to determine whether he has bipolar illness . . . entirely secondary to MS or in addition to." (AR 1150.) Dr. Lentz explained that "[t]he degree of his demyelization suggests long-standing MS as well. Individuals with cognitive problems from MS frequently ha[ve] mood symptoms as well." (AR 1150.) Dr. Lentz's assessment diagnosed "[m]ood disorder with manic depressive symptoms secondary to Multiple Sclerosis. Bipolar mood disorder type 2, possibly an independent process, although hard to be certain. Cognitive problems secondary to multiple sclerosis. Personality change secondary to multiple sclerosis." (AR 1151.)

At an initial visit in April 2012, Dr. Lentz opined that "it seems quite clear based on clinical history and examination that he would qualify for long-term disability by any definition, because of his cognitive and emotional problems, which I think are largely secondary to multiple sclerosis." (AR 1158.) Dr. Lentz also noted that Schmitz's "judgment [is] significantly impaired by cognitive and affective symptoms." (AR 1158.) In a later April 2012 visit, Dr. Lentz again expressed uncertainty about the relationship between Schmitz's cognitive symptoms and his MS, explaining "because he has severe cognitive and personality change on the basis of some cortical demyelinating plaques, it is not clear that his bipolar disorder was independent of multiple sclerosis as opposed to intrinsic to that disease process." (AR 1161.) At the later visit Dr. Lentz noted that there was much improvement in Schmitz's medical status "indicating that bipolar symptoms caused some of his disinhibition, not just frontal lobe lesions." (AR 1162.)

Dr. Lentz wrote a letter to Schmitz's attorney dated October 22, 2012. (AR 1189-90.) In the letter Dr. Lentz opined:

> To a reasonable degree of . . . medical certainty, Mister Schmitz had significant symptoms of MS prior to the time that he was terminated by at [sic] Banner Engineering.  These symptoms were manifested by cognitive problems and by bipolar symptoms that were more like than the [sic] the direct manifestation of Multiple Sclerosis.   At the that time he was terminated from Banner Engineering, he clearly had symptoms of both MS and bipolar mood disorder secondary to MS.

(AR 1190.)  Dr. Lentz also explained that during his time at PPT Schmitz's behavior was "still problematic" but "apparently attracted less attention at a smaller and more tolerant company.  Nevertheless, he was terminated by PPT Vision for the same kinds of behavior noted at his previous employer."  (AR 1190.)  Dr. Lentz concluded:

> To a reasonable degree of medical certainty, the behavior of Mister Schmitz clearly impacted his functioning at both employers mentioned above, and caused the poor performance that led to his being fired by both employers.
>
> It is more likely than not the chest [sic] Bipolar Mood Disorder is a direct result of his MS.  These symptoms of MS and secondary bipolar disorder in 2008 was [sic] the direct cause of lost employment.  These same symptoms were the cause of his termination from PPT Vision in early 2011.  He functioned at the second job only with the help of his wife, Chris, who managed his calendar, kept track of his appointments, and provided organization that he could not provide for himself.  To a reasonable degree of medical certainty, despite employment at PPT Vision, he has been disabled from adequately performing employment that requires executive functioning, interaction with people, and cognitive skills, since June of 2008.

(AR 1190.)

### 3.    Statement from Mrs. Schmitz

Schmitz's ex-wife, Kris Schmitz, submitted a statement on Schmitz's behalf for purposes of appeal.  (AR 1182-83.)  Kris explained that "beginning in approximately 2005 and getting worse in 2007-2008, I began to notice changes in both Jeff's

managerial/cognitive skills and/or his moods." (AR 1182.) Kris noted that Schmitz showed significant sings of fatigue, his memory declined markedly, and his intellectual and organizational skills declined also. (AR 1182.) Kris began keeping track of Schmitz's business appointments and took over the family's finances. (AR 1182-83.) Kris also explained that people at work noticed changes in his moods, "[h]e could be very high or manic at times and depressed at others. . . . When he was manic he seemed to have no control or sense of appropriateness. He would interrupt, make racist or sexist comments; be belligerent and generally obnoxious." (AR 1183.)

### 4.      Statement from Coworker

For purposes of appeal, Schmitz also produced a statement from a coworker, Stephen Maves, who worked with Schmitz at both Banner and PPT. (AR 1179.) Maves worked with Schmitz from 2002 to 2008 and stated that Schmitz "became known at Banner as a person with poor impulse control. He would frequently interrupt during meetings, and say or do things that were inappropriate in group settings." (AR 1179.) Maves noted that Schmitz's "attention and concentration also became a problem. The materials that Jeff produced . . . were of low quality. Again this was a surprise to those who had worked with him the longest because we had come to expect better products from him." (AR 1179.) Finally, Maves explained that he had seen "the same lack of impulse control, and generally inappropriate behavior" by Schmitz hinder his performance at PPT. (AR 1179.)

### B.      Review by Dr. Marcus Goldbloom

On January 17, 2013, board certified psychiatrist Dr. Marcus Goldbloom reviewed Schmitz's medical records and the other files in Schmitz's claim for LTD benefits. (AR 1287-88.)  Dr. Goldbloom first noted that Schmitz's diagnosis of bipolar disorder was adequately supported by his medical history, explaining that "[t]he claimant has a history of hypomanic/manic behavior accompanied by inappropriate behavior, disinhibition, and pressured speech and was ultimately hospitalized for severe abnormalities in mental status and markedly inappropriate behavior." (AR 1293.)  But Dr. Goldbloom concluded that "[w]hether or not a diagnosis of mood disorder due to multiple sclerosis or mood disorder due to medication issues can be established is beyond my expertise." (AR 1293.)

With respect to the worsening of Schmitz's condition prior to termination, Dr. Goldbloom opined that "for the time period leading up to 6/16/08, there was no evidence of worsening in the claimant's condition.  Data strongly suggests overall stability with no significant alteration or changes in treatment planning and no emergent transition to more intense levels of care." (AR 1293.)  Dr. Goldbloom also indicated that "[f]rom 7/3/08 through 10/1/08, the claimant was largely stable and the medical data do not support any evidence of continuous functional impairment due to a psychiatric issue or condition." (AR 1294.)  Dr. Goldbloom opined that although there were distinct periods of Schmitz's medical history in which he was impaired "continuous functional impairment cannot be supported since more times than not, the claimant revealed a

completely intact mental status examination with no overt evidence of significant or severe psychopathology." (AR 1295.)

###    C.    Review by Dr. Michael Raymond

On January 17 and 22, 2013, Dr. Michael Raymond, a board certified neuropsychologist conducted a review of Schmitz's claim file. (AR 1298-1311.) Dr. Raymond concluded that Schmitz's medical file supported the finding that Schmitz had cognitive impairment "in areas including executive functions, visual construction, processing speed, and psychomotor abilities. . . . Similar findings are often observed with multiple sclerosis, although psychological factors may exacerbate this executive dysfunction as well." (AR 1304.) With respect to the period between July 3, 2008 and October 1, 2008, Dr. Raymond noted "[t]here is no evidence within the reviewed medical records to support or suggest cognitive impairment that had resulted in a neuropsychological referral." (AR 1305.) Additionally, Dr. Raymond explained that there was no evidence that Schmitz was experiencing cognitive impairment that precluded him from performing the mental capacities required for the occupation of Corporate Business Manager. (AR 1310-11.)

> With respect to Dr. Lentz's October 2012 letter, Dr. Raymond explained:
>
> There is no documented objective evidence (e.g., neuropsychological data) to support Dr. Lentz's statements in his letter dated 10/22/12, indicating that "he has been disabled from adequately performing employment that requires executive functioning, interaction with people, and cognitive skills, since June of 2008." Thus, during that time period, there is no neurocognitive evidence to support Mr. Schmitz's inability to perform the occupational duties of a Corporate Business manager.

(AR 1308.)

Finally, Dr. Raymond concluded:

As previously noted, Mr. Schmitz has demonstrated a gradual neurocognitive and behavior deterioration dating back many years. Initial signs and symptoms of a demyelinating disorder (MS) apparent began with muscle weakness and paresthesias commencing sometime in 1994. Over the course of many years, the symptoms gradually worsened especially with regard to behavior decompensation. He had previously been diagnosed and treated for depression and bipolar disorder. A formal diagnosis of demyelination (MS) was made after he had undergone a cerebral MRI in 2011. A combination of behavioral and neurocognitive changes/deficits resulted in him being terminated from positions at Banner Engineering and PPT Vision. Most recent neuropsychological test results (1/25/12) support neurocognitive deficits associated with frontal and subcortical involvement, greater in the right than left hemisphere. These findings would clearly translate into restrictions and limitations in the position of business manager.

(AR 1309.) Raymond clarified that this conclusion "was based on subjective reports of cognitive dysfunction" and that "from a neuropsychological standpoint there was no objective evidence to support that there was cognitive impairment that resulted in him being terminated." (AR 1311.)

## D. Outcome of Appeal

On March 8, 2013, Sun Life informed Schmitz that it was upholding its denial of LTD benefits. (AR 1508.) Sun Life relied on the conclusions of Dr. Goldman and Dr. Raymond that no disabling cognitive impairment existed at the time of Schmitz's termination from Banner. (AR 1522-25.) Sun Life explained:

Sun Life acknowledges that Mr. Schmitz was diagnosed with MS in 2011, and that the condition likely started years earlier. However, because the cause of Mr. Schmitz' symptoms was identified, it does not automatically mean that those symptoms rendered him Totally Disabled since July of

- 37 -

2008.  Inarguably, as of August 2011, when Mr. Schmitz was hospitalized due to a psychotic episode, and when he underwent his first neuropsychological evaluation, at that time he was unable to perform the occupational duties of Corporate Business Manager.  However, as we find that Mr. Schmitz was not Totally and/or Partially Disabled from July 3, 2008, his LTD coverage under the Policy terminated once his employment with Banner Engineering ended, in accordance with the Policy's termination provisions.  Since his coverage under the Policy was not in effect as of August 2011, Mr. Schmitz does not qualify for benefits for August 2011 onward under this Policy.  Additionally, we restate that Mr. Schmitz was not under regular and continuing care with respect to his claimed cognitive deficits, as required by the Policy, until August 2011.

(AR 1529.)

## XII.   THE PRESENT ACTION

On March 18, 2013, Schmitz filed a complaint in this Court against Sun Life seeking judicial review of Sun Life's denial of LTD benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).  (Compl., Mar. 18, 2013, Docket No. 1.)  Schmitz alleges that "[t]he decision to deny the LTD benefits is in violation of the Plan, a violation of ERISA, and a violation of the fiduciary duties owed by the Defendant to the Plaintiff."  (*Id.* ¶ 10.)  The parties now bring cross motions for summary judgment.

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

To decide if either party is entitled to summary judgment, the Court must determine if Sun Life abused its discretion in denying Schmitz's claim. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan confers discretion on the plan administrator, the Court applies a deferential abuse-of-discretion standard of review. *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011); *see also Bounds v. Bell Atl. Enters. Flexible Long-Term Disability Plan*, 32 F.3d 337, 339 (8th Cir. 1994). It is undisputed that the Policy at issue here provides Sun Life with the "entire discretionary authority" to determine eligibility for benefits and construe the terms of the Policy. (AR 123.) Accordingly, the Court will apply the abuse of discretion standard to Sun Life's determination.

Under the abuse of discretion standard, the Court "will reverse the plan administrator's decision only if it is arbitrary and capricious." *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 896 (8th Cir. 2009) (internal quotation marks omitted). In ascertaining whether a decision was arbitrary and capricious the Court asks "whether the decision to deny benefits was supported by substantial evidence, meaning more than a scintilla but less than a preponderance." *Id.* at 897 (alteration and internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *River v. Edward D. Jones Co.*, 646 F.3d 1029, 1033 (8th Cir. 2011) (internal quotation marks omitted). "Review of an administrator's decision under an abuse of discretion standard, though deferential, is not tantamount to rubber-stamping the result. On the contrary [the Court] review[s] the decision for reasonableness, which requires that it be supported by substantial evidence that is assessed by its quantity and quality." *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005). But "[p]rovided the decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made." *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000) (internal quotation marks omitted). "The requirement that the [plan administrator's] decision be reasonable should be read to mean that a decision is reasonable if a reasonable person **could** have reached a similar decision, given the evidence before him, not that a reasonable person **would** have reached that decision." *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 887 (8th Cir. 2002) (emphasis in original) (internal quotation marks omitted). Where, as here, the insurer "had the responsibility of

both determining eligibility for benefits and also paying those benefits" the Court considers "that conflict as a factor when determining if an administrator has abused its discretion." *Silva v. Metro. Life Ins. Co.*, --- F.3d ---, 2014 WL 3896156, at *5 (8th Cir. 2014) (internal quotation marks omitted).

In its motion for summary judgment Sun Life argues, among other things, that its determination that Schmitz was not entitled to LTD benefits is supported by substantial evidence and should therefore be affirmed. Schmitz contends that summary judgment in his favor is warranted because Sun Life's decision was arbitrary and capricious.

## II.     SUBSTANTIAL EVIDENCE SUPPORTING SUN LIFE'S DECISION

In order to be eligible for LTD benefits under the Policy, Schmitz is required to demonstrate that he was totally or partially disabled within the meaning of the Policy as of July 2, 2008 (the day his coverage terminated) and continuously through the 90 day elimination period until September 30, 2008. (AR 72, 101.) Schmitz bears the burden of proving his entitlement to benefits under the terms of the Policy. *See Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992). The Court notes that the relevant inquiry for purposes of appeal (and Sun Life's determination) is, more specifically, whether Schmitz's multiple sclerosis caused him to be disabled within the meaning of the Policy upon his termination from Banner in July 2008. This is so because the Policy requires that the disability claim be "because of Injury or Sickness." (AR 83.) Therefore, it is irrelevant whether Schmitz was disabled when he was diagnosed with multiple sclerosis in 2011 or whether he may have been disabled by some other condition at the

time of his termination from Banner.  *See Eastman v. Prudential Ins. Co. of Am.*, Civ. No. 06-4123, 2008 WL 250597, at *17 (D. Minn. 2008) (noting that "[t]he parties agree that Eastman is disabled and that Eastman has been diagnosed with fibromyalgia" but finding that plaintiff was required to prove that her impairment was "caused by fibromyalgia" and that she "was disabled by fibromyalgia" during the relevant time period).  The Court concludes that, based on all of the evidence before Sun Life at the time it made its determination that Schmitz was not disabled, Sun Life's decision was supported by substantial evidence, and was neither arbitrary nor capricious.

Schmitz argues that Sun Life's decision was unreasonable because he "provided a consistent medical history, witness statements, objective testing, and the opinion of two treating doctors in support of his position."  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 13, Apr. 15, 2014, Docket No. 44.)   Schmitz argues that Sun Life's decision was unreasonable and not supported by substantial evidence for a number of reasons which generally fall into three categories: (1) his treating physicians supported disability dating back to 2008 and Sun Life acted unreasonably in disregarding those opinions in favor of its reviewing physicians; (2) the reviewing physicians actually found disability dating back to 2008 and to the extent they did not, they inappropriately relied on a totally incapacitated standard for determining disability – rather than the total disability definition from the Policy; and (3) the reviewing physicians did not acknowledge the statements of Schmitz, his ex-wife, and his coworker.  The Court will address each of these contentions in turn.

## A.    Treating Physicians

Schmitz argues that his treating physicians presented overwhelming evidence that he was totally disabled in July 2008 because of his multiple sclerosis.  This interpretation overstates the actual conclusions reached by his treating physicians, as demonstrated by the record before Sun Life.   The Administrative Record reflects that it was not unreasonable for Sun Life to conclude that doctors treating Schmitz at the time he allegedly became disabled did not consider Schmitz's cognitive and mental issues – whether caused by multiple sclerosis or not – to be preventing him from performing the essential functions of his job at Banner.   Schmitz was treated by Dr. Callahan from February 2007 through September 2008.  Although the notes from Dr. Callahan indicate that Schmitz suffered from mental health issues – including anxiety and depression and bipolar disorder, the notes also contain numerous indications that these problems were not causing Schmitz to be unable to perform the essential tasks and functions of his position at Banner.   For example, in October 2007 Schmitz was described as "less anxious and less depressed" and reported that "he is working, he is adequately productive, he has been assured that there is no plan afoot to fire him or lay him off." (AR 738.)  In January 2008 Schmitz continued to work full time and was "traveling and performing."   (AR 1756.)   In April 2008, Schmitz reported that he had energy and creativity at work, and had just received a good evaluation.  (AR 740.)  Therapist Driscoll similarly noted that in the spring of 2008 Schmitz reported that his mood was stable and that work was going better.  (AR 214, 218-19.)  Furthermore, notes from Driscoll after Schmitz's termination reflect that Schmitz continued to look for work, and there was no

discussion that Schmitz's mental and cognitive issues may have affected his ability to work.

Schmitz's treating physician Dr. Anderson also indicated, based on his tests in January 2009 that Schmitz had a GAF score of 60 and in the past year a maximum score of 85 – within the range of absent or minimal symptoms, good function in all areas, and no more than everyday problems or concerns.  (AR 241.)  In June 2009 Dr. Anderson also reported that Schmitz was doing well on his medications and was able to concentrate.  (AR 240.)  Significantly, in both May and September 2010 Anderson noted that Schmitz's "[m]ental status shows normal function" and that his "[m]ental status is really normal," and in December 2010 reported that Schmitz's mood was stable. (AR 231-32.)  Therefore, the Court cannot conclude that Sun Life abused its discretion when it concluded that there was no contemporaneous evidence of cognitive and mental disability such that Schmitz was totally disabled within the meaning of the Policy at the time of Schmitz's July 2008 termination.

Additionally, the opinions of Schmitz's treating physicians immediately preceding and following his multiple sclerosis diagnosis do not, as Schmitz claims, unequivocally establish the necessary connection between his work performance in 2008 and his multiple sclerosis.  After his August 2011 hospitalization, Schmitz was diagnosed with "[o]rganic psychosis and mood disorder secondary to multiple sclerosis."  (AR 664.) And his internal medicine assessment specifically stated that it was "[u]ncertain as to what degree mood liability may be contributed to by patient's multiple sclerosis."  (AR 665.)  An in-patient neurology consult further concluded that "it is nearly impossible to

know" what extent of Schmitz's "psychiatric dysfunction" were related to an underlying mood disorder as opposed to "cognitive changes secondary to multiple sclerosis." (AR 665.)  When Dr. Schenk evaluated Schmitz in December 2011 he opined that Schmitz had probably had MS for "at least nine years," but that assessment was based solely on Schmitz's self-report that he began experiencing problems with his left leg nine years ago.  Dr. Schenk noted that Schmitz's cognitive impairment "likely relates to both the multiple sclerosis as well as perhaps his psychiatric disorder" but "further evaluation" was clearly needed.  (AR 2011.)  Similarly, Dr. Davis – who provided an attending physician statement as part of Schmitz's application for LTD benefits opined that Schmitz was severely or extremely impaired as of October 2011.  With respect to the effects of MS on Schmitz prior to October 2011, Dr. Davis explained only that Schmitz had "long standing mood issues leading to diagnosis of bipolar, MS recently diagnosed but felt to be active prior to diagnosis." (AR 60.)  None of these opinions goes directly to the issue of whether, in July 2008, Schmitz was unable to perform the primary functions of his job because of multiple sclerosis.  At most, these opinions rely on the general proposition that mood disorders often accompany multiple sclerosis, but say nothing about whether Schmitz's mood disorder – even if caused by multiple sclerosis was severe enough in July 2008 to prevent him from performing his job at Banner.

Finally, Schmitz relies heavily on the two doctors that examined him in 2012. Dr. Fuhrman concluded that Schmitz's neuropsychological results are abnormal.  (AR 996.)  Dr. Fuhrman also indicated he had reviewed Schmitz's head CT scan from 1994, and hypothesized that "[a]lthough the question of demyelinating disease was not

- 45 -

entertained at the time, I suppose that stigmata of MS may have been emerging by then," and that Schmitz's history of bipolar was relevant because some of these features were likely related to the involvement of MS.  (AR 997.)

Dr. Lentz also saw Schmitz for a psychiatric evaluation from April through October 2012.  After an initial evaluation Dr. Lentz explained that "it seems quite clear based on clinical history and examination that he would qualify for long-term disability by any definition, because of his cognitive and emotional problems, which I think are largely secondary to multiple sclerosis."  (AR 1158.)  Dr. Lentz concluded on multiple occasions that it was difficult to determine whether Schmitz had bipolar illness entirely secondary to, or in addition to MS.  (AR 1150, 1161.)  In particular Dr. Lentz noted that Schmitz's mental status and cognitive difficulties had changed over the course of Lentz's evaluation suggesting that "bipolar symptoms caused some of his disinhibition, not just frontal lobe lesions."  (AR 1162.)  Despite these somewhat equivocal findings regarding Schmitz's status as disabled in July 2008 because of multiple sclerosis, the letter Dr. Lentz sent to Schmitz's attorney in October 2012 after Schmitz's claim was denied takes a much stronger stance, concluding that "[t]o a reasonable degree of . . . medical certainty, Mister Schmitz had significant symptoms of MS prior to the time that he was terminated by at [sic] Banner Engineering."  (AR 1190.)  Dr. Lentz further opined that Schmitz's symptoms of multiple sclerosis and secondary bipolar disorder were the direct cause of his lost employment.  (AR 1190.)

Although Dr. Lentz, and to a lesser extent Dr. Fuhrman opined that multiple sclerosis disabled Schmitz as of July 2008, as explained more fully below – a plan

administrator's decision is not arbitrary and capricious merely because it rejects the opinion of a treating physician[5] "unless the record does not support the denial." *Midgett*, 561 F.3d at 897 (internal quotation marks omitted); *see also Weidner v. Fed. Express Corp.*, 492 F.3d 925, 930 (8th Cir. 2007) (explaining that the administrator did not abuse its discretion in accepting the opinions of consultative neurology specialists, even though claimant's treating physician opined that the claimant continued to be "fully disabled" because "ERISA affords courts no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician" (internal quotation marks omitted)). In other words, "[w]hen a conflict in medical opinions exists, the plan administrator does not abuse his discretion by adopting one opinion, if reasonable, and finding that the employee is not disabled." *Smith v. Unum Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir. 2002). Therefore, based on the numerous opinions of the physicians that treated Schmitz in 2008 – and did not describe disabling psychological and cognitive dysfunctions – and the opinions of the reviewing physicians concluding that Schmitz was not disabled, the Court cannot conclude that Sun Life abused its discretion in rejecting Dr. Lentz's opinion.

Furthermore, the Court reviews "both the quantity **and quality** of evidence before a plan administrator." *Smith*, 305 F.3d at 794 (emphasis added). Here, it was not an

---

[5] It does not appear from the record that Dr. Lentz was actually a treating physician, as the term is used in the case law, but was instead retained for a short period of time for purposes of conducting an independent evaluation of Schmitz's psychological condition. Because Dr. Lentz's characterization as a treating physician does not change the Court's conclusion that Sun Life was entitled to reject his opinion in favor of the opinions of the reviewing physicians, the Court has adopted the characterization of Dr. Lentz advocated by Schmitz for purposes of this opinion.

abuse of discretion for Sun Life to give less weight to Dr. Lentz's conclusion in October 2011 that Schmitz's multiple sclerosis was the direct cause of his lost employment, because this conclusion was somewhat inconsistent with the determinations Dr. Lentz made after examining Schmitz.  Specifically, the October 2011 conclusion was at odds with Dr. Lentz's earlier determination that it was almost impossible to tell whether the symptoms Schmitz originally suffered were due to a bipolar disorder independent from his multiple sclerosis and that fluctuations in Schmitz's mood during the course of Dr. Lentz's evaluation suggested involvement of a disorder other than multiple sclerosis.

### B. Reviewing Physicians

Schmitz also contends that Sun Life's denial was not supported by substantial evidence because some of the reviewing physicians actually support his contention that he was disabled, and the others did not opine on the relevant issue – whether Schmitz was disabled in July 2008 within the meaning of the Policy.  The Court concludes, however, that based on the evidence as a whole, Sun Life was reasonable in relying on the opinions of the reviewing physicians to determine that Schmitz was not disabled.

In her January 2012 review, Dr. O'Connor was specifically asked to address whether Schmitz's August 2011 multiple sclerosis diagnosis could have been responsible "for his issues holding employment since 2008."  (AR 2058-59.)  This question was directed at the relevant inquiry – whether Schmitz, because of multiple sclerosis was unable to perform the essential tasks, functions, skills, or responsibilities of his job. Dr. O'Connor's response was an unequivocal no, explaining "[t]here is no information on

file indicating that Mr. Schmitz had cognitive problems around 6/16/08." (AR 2059.) Dr. O'Connor noted that psychiatrist notes indicated complaints about concentration and other issues but the notes largely "suggest intact mental status." (AR 2059.)

Dr. Mirkin was also asked to opine on questions directly relevant to Sun Life's disability determination such as whether Schmitz's medical records reflected an increase in symptoms or treatment leading up to his termination "that would support that his firing was a result of his mental health issues." (AR 2065.) Dr. Mirkin did acknowledge that the relationship between multiple sclerosis and mood disorders remains unclear and also acknowledged that, based on Schmitz's MRI he had likely had multiple sclerosis for "some time." (AR 2071-72.) But Dr. Mirkin still concluded that there was no evidence that Schmitz had any neurological symptoms as a result of multiple sclerosis until July 2011. Dr. Mirkin also noted that Driscoll's notes provided some evidence of mood changes in the period leading up to Schmitz's termination but "these symptoms were not described as at a level of severity that would have obviously interfered with his performance at his job." (AR 2073.) Finally, Dr. Mirkin directly addressed the argument advanced in this litigation by Schmitz, explaining:

> It should be noted that there is little doubt that throughout the period that is under review Mr. Schmitz had an underlying neurodegenerative disease process taking place. It is inaccurate to state that because he was eventually discovered to have this illness that this automatically implies that he was impaired by the process. It appears that he had no recognizable symptoms of multiple sclerosis and it cannot be assumed that his mood disorder was solely the result of his multiple sclerosis although unrecognized at that time. Even if his mood symptoms could in part be attributable to this disease his mood symptoms were not at a level of severity that would have limited him.

(AR 2074.)  These opinions were based on the information in Schmitz's medical file, and, contrary to Schmitz's contention, did specifically address the issue in question – whether Schmitz's multiple sclerosis was affecting his cognitive functions in July 2008 such that he was unable to perform his job and was therefore terminated.  Because both Dr. O'Connor and Dr. Mirkin answered no to this question, Sun Life did not act unreasonably in crediting their conclusions and denying Schmitz's request for benefits.

Furthermore, after Schmitz appealed, Sun Life obtained opinions from two additional reviewing physicians.  Although Dr. Goldbloom could not say whether Schmitz's mood disorder was due to his multiple sclerosis, he concluded based on the evidence in Schmitz's medical record that leading up to his termination there was "overall stability" in Schmitz's condition and "no significant alteration or changes in treatment planning and no emergent transition to more intense levels of care" that would likely be present had Schmitz's condition changed and caused him increased impairment. (AR 1293-94.)  This opinion further supported Sun Life's conclusion that Schmitz was not disabled.

Finally, Schmitz makes much of Dr. Raymond's opinion.  Dr. Raymond concluded that there was no evidence that Schmitz was experiencing cognitive impairment that precluded him from performing the mental functions required for his position at Banner.  (AR 1308, 1310-11.)  Dr. Raymond did state that "[a] combination of behavioral and neurocognitive changes/deficits resulted in [Schmitz] being terminated from positions at Banner Engineering and PPT Vision," (AR 1309), but clarified, upon Sun Life's request that this conclusion "was based on subjective reports of cognitive

dysfunction" and that "from a neuropsychological standpoint there was no objective evidence to support that there was cognitive impairment that resulted in him being terminated." (AR 1311.) Dr. Raymond's opinion – even viewed in the light most favorable to Schmitz and prior to being clarified – does not provide direct support for Schmitz's contention that mental and cognitive issues **associated with multiple sclerosis** resulted in his termination from Banner and therefore demonstrated that he was disabled at that time. The opinions of these reviewing physicians, taken together, "accurately represent [Schmitz]'s medical record and adequately address the evidence supporting h[is] claim for disability." *See Midgett*, 561 F.3d at 898. Specifically each reviewing doctor acknowledged the existence of mood disorder issues observed by Schmitz's treating physicians in 2008 but concluded that "these findings did not demonstrate that [Schmitz] was unable to perform h[is] job duties" as a result of multiple sclerosis. *See id.*

Schmitz relies heavily on *Woo v. Deluxe Corp.*, 144 F.3d 1157 (8th Cir. 1998), *abrogated in part by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-17 (2008), *as recognized in Waldoch v. Medtronic, Inc.*, --- F.3d ---, 2014 WL 3264187, at *6 n.3 (8th Cir. 2014) and *Bray v. Sun Life & Health Ins. Co. (U.S.)*, 838 F. Supp. 2d 1183 (D. Colo. 2012) to support his claim. The Court concludes, however, that these cases are readily distinguishable. In *Woo*, the court concluded that the administrator – Hartford – lacked sufficient support in the record to justify its denial of benefits. 144 F.3d at 1162. Hartford had denied Woo's claim "without seeking any independent medical review" and had disregarded the opinions of two treating physicians who examined Woo immediately before and after her termination. *Id.* at 1161. Both treating physicians – although they

were unaware that Woo had scleroderma at the time of her resignation – "connected the physical problems that she experienced during the insured period to her eventual diagnosis of scleroderma." *Id.* at 1162. The court concluded that it was error for Hartford to deny this claim "without having it reviewed by an appropriate expert." *Id.* Unlike in *Woo*, here Sun Life obtained four expert reviews of Schmitz's medical file to support their denial of benefits. Furthermore, unlike Woo's treating physicians, Schmitz presented no evidence from physicians that had treated him at the time of the onset of the alleged disability that connected his disability to his later diagnosis of multiple sclerosis.[6] Therefore, *Woo* does not control the outcome here.

Similarly, in *Bray*, the court concluded that the administrator had abused its discretion in denying LTD benefits because it had ignored overwhelming medical evidence that connected Bray's termination to his later diagnosis of a brain tumor. *Id.* at 1198. But in *Bray* the administrator did not present any of its own medical evidence and ignored the opinions of numerous treating doctors that unequivocally tied Bray's termination to his brain tumor. *Id.* at 1195-96. Here, Sun Life did provide numerous medical opinions to rebut the medical providers relied upon by Schmitz, and Schmitz did not present the same type of "substantial medical and non-medical evidence" that he was unable to perform his job duties satisfactorily because of his undiagnosed multiple sclerosis. *Id.* at 1198.

---

[6] Additionally, *Woo* applied a more exacting standard of review than the abuse of discretion review that governs the Court's review of Sun Life's claims. 144 F.3d at 1161-62.

C.      Consideration of Witness Statements

Finally, Schmitz argues that Sun Life was unreasonable in adopting the opinions of the reviewing doctors because those doctors did not review the statements provided by Schmitz, his ex-wife, and his coworker.  Although it can be an abuse of discretion for an administrator to adopt opinions of reviewing physicians that are based on incomplete or inadequate materials, the Court concludes that there was no abuse of discretion here because the information contained in the statements submitted by Schmitz was largely duplicative of information already in the administrative record.  For example, Schmitz's and his ex-wife's concerns about his mental status are reflected in the notes of his medical providers in 2008, and the statement of his coworker is largely duplicative of performance reviews received by Schmitz at Banner.  Furthermore it is unclear how the opinions from these statements that Schmitz suffered from a mood disorder at the time of his termination – which even Sun Life does not dispute – would have required the reviewing doctors to conclude that Schmitz was disabled by multiple sclerosis at the time of his termination.

Accordingly, the Court concludes that Sun Life's decision to deny benefits was not arbitrary or capricious and was based on substantial evidence.  The Court notes that the administrative record in this case certainly contains evidence "both for and against [Schmitz]'s claim."  *Smith*, 305 F.3d at 796; *see also Weidner*, 492 F.3d at 930 ("Weidner is seriously impaired by multiple sclerosis, and whether that disease was totally disabling in April 2003 is a close question.  However, after careful review, like the district court we conclude that substantial evidence in the administrative record as a whole supports the

Committee's decision . . . ."). The Court's role here is limited by the deferential standard of review. In other words, it is irrelevant whether the Court might have reached a different conclusion based on the evidence here. It is sufficient that it was reasonable for Sun Life to reach its conclusion that Schmitz was not disabled because of multiple sclerosis as of July 2008, as required to obtain benefits under the Policy. Specifically, the record demonstrates that four reviewing physicians concluded that Schmitz was not disabled, contemporaneous treating physicians did not describe Schmitz as disabled, and Schmitz continued to be employed in a relatively similar position following his termination at Banner. Therefore, the Court will grant Sun Life's motion for summary judgment.[7]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Defendant's Motion for Summary Judgment [Docket No. 28] is **GRANTED**.

2.   Plaintiff's Motion for Summary Judgment [Docket No. 36] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  October 31, 2014            ____s/ John M. Tunheim____
at Minneapolis, Minnesota.                JOHN R. TUNHEIM
                                    United States District Judge

---

[7] Because the Court concludes that Sun Life's decision was supported by substantial evidence it has not considered Sun Life's additional arguments in support of summary judgment – including that Schmitz's claim was untimely under the Policy and was barred by a release agreement he signed with Banner Engineering after his termination.